UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
THE WEINSTEIN COMPANY,

                         Plaintiff,

          - against -                            **MEMORANDUM AND ORDER**

SMOKEWOOD ENTERTAINMENT GROUP, LLC,              09 Civ. 1972 (NRB)

                         Defendant.
-----------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/25/09

Plaintiff The Weinstein Company, LLC, ("plaintiff" or "TWC") commenced this action on February 4, 2009, against defendant Smokewood Entertainment Group, LLC ("defendant" or "Smokewood"), seeking monetary damages for defendant's alleged breach of an agreement for the licensing and distribution rights to the motion picture Push: Based on the Novel by Sapphire ("Push"). Pursuant to Fed. R. Civ. P. 12(b)(6), defendant now moves to dismiss plaintiff's claim for failure to state a claim upon which relief can be granted.

For the following reasons, defendant's motion is granted.

## BACKGROUND[1]

Defendant is the financier and co-owner of Push, a dramatic motion picture based on a novel about a young African-American mother in Harlem in 1987. (Complaint ("Compl.") ¶¶ 1, 8.) The film opened to critical acclaim at the 2009 Sundance Film Festival, which was held in Park City, Utah, and won both the prestigious grand jury prize and audience award in the U.S. dramatic competition (only the third film in the history of the festival to do so). (Id. ¶ 9.)

On January 24, 2009, shortly after the film's screening at Sundance, executives from TWC traveled to Park City to discuss the possibility of purchasing distribution rights to Push. (Id. ¶ 11.) Cinetic Media, Inc., John Sloss, and Bart Walker acted as agents of Smokewood during the course of these negotiations. (Id. ¶¶ 5, 12.)

According to the Complaint, Cinetic offered TWC the licensing and distribution rights to Push on January 27, 2009, contingent upon TWC's acceptance of "a series of specific terms and demands." (Id. ¶ 13.) Those terms included a minimum fee payable on a fixed schedule, a distribution fee that varied by

---

[1] The following factual background and allegations are derived from plaintiff's Complaint as well as from e-mail exchanges excerpted in the Complaint and attached in full to plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl.'s Mem."). For the purposes of this motion, the Court assumes the veracity of the plaintiff's allegations and the contents of the e-mails.

territory, bonuses for box office performance and awards, and the preservation of editing rights. (Id. ¶ 14.) Later that day, TWC accepted the offer and agreed to all of the terms and demands put forward by Cinetic, which in turn promised to provide TWC with a written agreement memorializing the terms of the deal. (Id. ¶ 15.) TWC promised to execute and return the written agreement. (Id.)

On the evening of January 27th, representatives for the parties engaged in an e-mail exchange that is at the center of the dispute before the Court. At 6:29 p.m., David Glasser of TWC sent a message to Sloss and Walker purporting to confirm a deal reached by the parties:

> Dear John and Bart:
>
> I am pleased to confirm on behalf of the Weinstein Company LLC that we have accepted the terms of your last proposal made by you during our breakfast meeting this morning and our subsequent telephone conversation with respect to the acquisition of the exclusive worldwide distribution rights in and to the feature film presently entitled "Push": based on a novel by Saphire" [sic]. Our attorneys are drafting a customary deal memorandum consistent with the terms we agreed upon and will be forwarding to you shortly.
>
> We are pleased to have concluded this deal, as it has been an incredible journey to get here and appreciate all your efforts.

(Pl.'s Mem., Shulman Decl. Ex. A at 2.) Eight minutes later, Walker responded as follows to Glasser's e-mail:

> Gentlemen-Since our last conversation, I have been on a call with the producers and financiers explaining every sentence. I will call you after. Not being at

3

> the breakfast, I don't know exactly what was discussed there, but am relaying the contents of our conversation this afternoon. Will call asap. Best, bw

(Id.)  At 7:05 p.m., Glasser followed up with another message, once again purporting to confirm a deal:

> Bart:
>
> Thank you for all your hard work on this title.  I just got off the phone with Harvey [Weinstein] and I am glad to confirm that we have a deal.  Additionally, we will work with you to accommodate your additional needs (i.e. Elephant Eye).[2]
>
> Best regards,

(Id. at 1.)  And in what was apparently the last written communication between TWC and Cinetic that evening, Walker responded with the following message at 7:12 p.m.:

> Guys, I'm explaining every detail to the producers and financiers and taking comments and will call you when this conversation is over.  Best, bw

(Id.)

---

[2] Plaintiff does not mention Elephant Eye either in its Complaint or its Opposition to Defendant's Motion to Dismiss. Defendant claims, however, that it had a prior agreement with Elephant Eye for the international distribution, sales, and licensing of Push.  (Defendant's Memorandum of Law in Support of Motion to Dismiss ("Def.'s Mem.") at 2.)

As explained further below, a court deciding a motion to dismiss must assume the veracity of the plaintiff's complaint and draw all reasonable inferences in plaintiff's favor. Consistent with that standard, and because the e-mail communications concerning Elephant Eye are not unambiguous, we assume that there was no deal in place with Elephant Eye that would have barred or otherwise impeded an agreement between the parties for the licensing and distribution of Push.

Approximately seven hours later, at 2:04 a.m. on January 28, 2009, Glasser wrote to Cinetic to inquire about the status of the written documentation for the deal. Glasser stated that "[e]arlier today, we accepted all of the terms and conditions of your offer, thereby closing a deal to acquire the rights to the film entitled 'Push'." (Pl.'s Mem., Shulman Decl. Ex. C at 1.) According to Glasser, TWC had agreed to offer its "assistance" with a "problem" that Smokewood had with Elephant Eye, but Glasser claimed that did not "in any way affect[] the existence of the deal we closed." (Id.) Glasser closed by stating that TWC had been "awaiting the written documentation of our deal" and that TWC "fully intend[ed] to enforce the deal . . . with or without written documentation." (Id.)

After a follow-up from Glasser (in which he again maintained that TWC would take "whatever action is necessary" to enforce the deal), Sloss and Walker responded at 4:42 a.m. (Id. at 2.) They wrote that there had "been no agreement reached" and claimed that there were several "[e]ssential points [that] had not and have not been agreed, including, without limitation, the division of profits between Weinstein and our client, and whether or not rights in the international territories could be

granted."    (Id.)[3]    Sloss and Walker asserted that "all points under discussion with Weinstein were subject to explanation to and review by our clients and their counsel."    (Id.)    At 4:50 a.m., Glasser replied that Sloss and Walker's e-mail "constitute[d] a repudiation of the agreement which we definitely did reach."    (Id. at 3.)

On February 2, 2009, Smokewood, Cinetic, and Lions Gate Entertainment Corp. ("Lionsgate") announced a deal under which Lionsgate was granted the distribution rights to Push.    (Compl. ¶ 22.)    TWC now alleges that Smokewood, by entering into the deal with Lionsgate, breached a contract between the parties that was reached on January 27th.

### DISCUSSION

### I.    Standard for Motion to Dismiss

When deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in plaintiff's favor.    Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).    A

---

[3] Sloss and Walker claimed that there was a prior agreement "with an international sales agent for the film" -- apparently alluding to Elephant Eye -- that they were "unable to harmonize" with TWC's offer to acquire worldwide rights.    (Pl.'s Mem., Shulman Decl. Ex. C at 2.)    Once again, given the procedural posture of the case, the Court accepts plaintiff's contention that no such deal would have impeded an agreement between the parties.

complaint must include "enough facts to state a claim for relief that is plausible on its face." Bell Atlantic Corp. v. Twombley, 550 U.S. 544, 570 (2007). A motion to dismiss may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009). "While legal conclusions can provide the framework for a complaint, they must be supported by factual allegations." Id. at 1950.

In deciding a motion to dismiss, the Court may consider exhibits to the complaint and documents incorporated into the complaint by reference. Police and Fire Ret. Sys. of Detroit v. Safenet, Inc., No. 06 Civ. 5759(PAC), 2009 WL 2391849, at *7 (S.D.N.Y. August 5, 2009) (citing In re Gildan Activewear, Inc. Sec. Litig., No. 08 Civ. 5048(HB), 2009 WL 1919618, at *4 n.3 (S.D.N.Y. July 1, 2009)).

## II. Plaintiff's Theories of Liability

Although plaintiff's Complaint identifies just one cause of action for breach of contract, plaintiff's Opposition to

7

Defendant's Motion to Dismiss proffers three separate theories of contract liability: (1) that plaintiff acquired an exclusive license to distribute Push (orally and/or through the January 27th e-mail exchange); (2) that, even if there was no exclusive license, plaintiff nevertheless acquired an implied non-exclusive license to distribute Push; and (3) that even in the absence of a valid license, defendant breached a binding preliminary commitment to negotiate in good faith with plaintiff over the licensing and distribution rights to the film.

The Court addresses each theory in turn and concludes that, under any of the theories advanced, plaintiff's claim for breach of contract must be dismissed.

### A.    Breach of an Exclusive License for Push

Plaintiff's principal theory of liability is that it acquired an exclusive license to distribute Push, the terms of which were violated when defendant subsequently closed its deal with Lionsgate.

Under the Copyright Act, the transfer of an exclusive license, including a license for distribution of a copyrighted work, must be effected through a signed writing from the copyright owner or its agent. The Copyright Act grants copyright owners a number of so-called "exclusive rights," including the right to distribute the work "to the public by sale or other transfer of ownership." 17 U.S.C. § 106(3). A

"transfer of copyright ownership" is defined as "an assignment .
. . exclusive license, or any other conveyance . . . of a
copyright or of any of the exclusive rights comprised in a
copyright." Id. § 101(a). A transfer of copyright ownership,
however, "is not valid unless an instrument of conveyance, or a
note or memorandum of the transfer, is in writing and signed by
the owner of the rights conveyed or such owner's duly authorized
agent." Id. § 204(a).

Defendant argues that there is no signed writing that
satisfies § 204(a) and that defendant therefore never granted
plaintiff an exclusive license to distribute Push. Read
liberally, and in conjunction with plaintiff's opposition
papers, the Complaint suggests two different avenues by which
TWC may have acquired an exclusive license. First, plaintiff
contends that the license was acquired orally, through
negotiations between the parties. Second, plaintiff contends
that the license was granted by defendant through the January
27th e-mail exchange.

### 1.   Oral Agreement to License Push

Notably, the Complaint does not allege a written, legally
binding agreement for the licensing and distribution rights to
Push. Rather, the Complaint alleges that there were
negotiations between January 24, 2009 and January 27, 2009,
resulting in an agreement that was never finalized in writing.

Indeed, plaintiff's Complaint focuses on the <u>absence</u> of a written agreement as grounds for its claim for breach of contract.  Plaintiff alleges, for instance, that prior to the January 27th e-mail exchange, Cinetic "promised TWC that they would immediately provide TWC with a written licensing and distribution agreement" and that "TWC promised to immediately execute and return such written licensing and distribution agreement."  (Compl. ¶ 15.)  The Complaint goes on to allege that Walker's responses to Glasser's e-mails on January 27th led plaintiff to believe that it would soon receive "immediate written documentation of the deal" but that "no written documentation of the Agreement was ever provided to TWC, on January 27, 2009 or thereafter."  (<u>Id.</u> ¶ 19.)

These allegations are consistent with the January 27th e-mails.  Writing on behalf of TWC, Glasser's e-mail of 6:29 p.m. states that TWC's "attorneys are drafting a customary deal memorandum with the terms we agreed upon."  (Pl.'s Mem., Shulman Decl. Ex. A at 2.)  The Complaint does not even allege, however, that TWC itself ever committed the agreement to writing.  Later that night, Glasser complained that TWC had been "awaiting the written documentation of our deal" and could not "understand why that documentation has been delayed."  (Pl.'s Mem., Shulman Decl. Ex. C at 1.)

To the extent that plaintiff alleges a purely oral agreement for the exclusive licensing and distribution rights to Push, that claim clearly fails as a matter of law. Prior to 1978, exclusive licenses could be granted orally or by conduct. See Eden Toys, Inc. v. Florelee Undergarment Co., 697 F.2d 27, 36 (2d Cir. 1982); 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.03[B][1] (2009). That changed, however, upon the enactment of § 204(a) of the Copyright Act. Today, a legally valid transfer of copyright ownership can occur only "by operation of law" or through "an instrument of conveyance, or a note or memorandum of the transfer, [which] is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a) (emphasis added).

Consistent with this clear statutory directive, courts in this Circuit have repeatedly held that a signed writing is required to effectuate a transfer of copyright ownership. See, e.g., Time, Inc. v. Kastner, 972 F. Supp. 236, 238 (S.D.N.Y. 1997); Techniques, Inc. v. Rohn, 592 F. Supp. 1195, 1197 (S.D.N.Y. 1984). Thus, any claim on the part of TWC that it acquired an exclusive license without a legally sufficient

11

writing (of some sort) is irretrievably flawed as a matter of law and, accordingly, dismissed.[4]

---

[4] Defendant argues that plaintiff's position in an unrelated litigation constitutes a "judicial admission" that prevents TWC from alleging the existence of an oral agreement for the licensing and distribution of Push. The case at issue concerned a claim to an oral right of first refusal for rights to the television program Project Runway. The Weinstein Company, the defendant in that proceeding, moved to dismiss the claim, arguing, among other things, that a right of first refusal had to be evidenced by a signed writing under § 204(a) of the Copyright Act. (See Def.'s Mem., Hayes Decl. Ex. E at 16.)

As a practical matter, defendant's argument appears to be irrelevant at this point. Although plaintiff's Complaint appears to rely on the flawed legal theory that the parties had an oral agreement for the licensing and distribution of Push, plaintiff's Opposition to Defendant's Motion to Dismiss argues that there is, in fact, a signed writing as required by § 204(a) and draws on facts alleged in the Complaint to advance this theory. Thus, at least now, plaintiff's position is consistent with its position in the Project Runway litigation.

Yet even if plaintiff had taken a different position in this case, its prior position would not constitute a "judicial admission," as defendant claims. Judicial admissions "are statements of fact rather than legal arguments made to a court." New York State Nat'l Org. for Women v. Terry, 159 F.3d 86, 97 n.7 (2d Cir. 1998).

Rather, it is conceivable that plaintiff could be judicially estopped from taking a different legal position in this case. Judicial estoppel "applies only in situations where a party both takes a position that is inconsistent with one taken in a prior proceeding, and has had that earlier position adopted by the tribunal to which it was advanced." Stichting ter Behartiging van de Belangen van Oudaandeelhouders in het Kapitaal van Saybolt Int'l B.V. v. Schreiber, 407 F.3d 34, 45 (2d Cir. 2005). As even defendant concedes, plaintiff's motion in the Project Runway case was denied for reasons unrelated to § 204(a), and its legal position on the provision was never adopted. (Def.'s Mem. at 9.)

Thus, the only barrier to any attempt by plaintiff to argue that a transfer of copyright ownership can be effected through a purely oral agreement would be the overwhelming and unequivocal legal authority to the contrary.

## 2. **Written Agreement to License Push**

Plaintiff's Opposition to Defendant's Motion to Dismiss advances a more plausible legal argument, one that better accords with the signed writing requirement of § 204(a). According to plaintiff, there is, in fact, a sufficient writing under § 204(a), namely, the January 27th e-mail exchange between the parties.

A writing "evidencing the transfer [of copyright ownership] need not be lengthy or detailed, but it must evidence the transfer with reasonable clarity." Rico Records Distribs. v. Ithier, No. 04 Civ. 9782(JSR), 2006 WL 846488, at *1 (S.D.N.Y. Mar. 30, 2006) (internal citations omitted); accord Papa's-June Music, Inc. v. McLean, 921 F. Supp. 1154, 1159 (S.D.N.Y. 1996). The writing requirement "is not unduly burdensome; it necessitates neither protracted negotiations nor substantial expense." Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 557 (9th Cir. 1990), cert. denied, 498 U.S. 1103, 111 S. Ct. 1003, 112 L. Ed. 2d 1086 (1991). "The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so." Id.

As the Ninth Circuit has explained, there are substantial policy concerns that underlie the signed writing requirement:

Common sense tells us that agreements should routinely be put in writing. This simple practice prevents misunderstandings by spelling out the terms of a deal in black and white, forces parties to clarify their thinking and consider problems that could potentially arise, and encourages them to take their promises seriously because it's harder to backtrack on a written contract than on an oral one. Copyright law dovetails nicely with common sense by requiring that a transfer of copyright ownership be in writing. Section 204 ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price. Most importantly, section 204 enhances predictability and certainty of copyright ownership -- Congress' paramount goal when it revised the Act in 1976. Rather than look to the courts every time they disagree as to whether a particular use of the work violates their mutual understanding, parties need only look to the writing that sets out their respective rights.

Id. It is for these reasons that the intention of a copyright owner seeking to transfer an ownership interest must be clear and unequivocal.

In this case, plaintiff has failed to allege the existence of a writing that satisfies the requirements of § 204(a). Neither of the e-mails sent by Walker on the evening of January 27th demonstrates a clear statement of intent to transfer an exclusive right in Push. Rather, it is the plaintiff whose e-mails demonstrate an unambiguous desire to enter into the deal. By contrast, Walker's responses on behalf of defendant contain nothing like the affirmative and unambiguous statement that § 204(a) requires from a copyright owner. After Glasser's first

14

e-mail of the evening, in which he purported to confirm a deal, Walker merely stated that he would be talking with the producers and financiers of the film and would call afterwards.   When Glasser followed up shortly afterward, once again purporting to confirm a deal, Walker provided a response that was as non-committal as his previous message.[5]

Plaintiff focuses on the e-mails from Glasser, one of its own principals in the negotiations, who demonstrated a clear intention to acquire the exclusive worldwide distribution rights to Push.   But this inverts the proper legal analysis.   On plaintiff's theory, because Glasser's e-mails were clear and evinced an unambiguous desire to finalize a deal, it was up to defendant to affirmatively reject Glasser's overtures.   This is precisely contrary to the way copyright law allocates the obligations among parties to a transfer of copyright ownership. If a copyright owner's intention in writing is unclear -- even deliberately so -- there is no legally valid transfer.

Plaintiff argues that when Walker signed his e-mails "Best, bw," this "recorded his agreement with Glasser's assertion that TWC had entered into a valid agreement for exclusive distribution rights to Push." (Pl.'s Mem. at 7.)   This argument

---

[5] This is, of course, to say nothing of the fact that approximately ten hours later, Walker and Sloss were quite clear in writing about their desire not to enter into a deal with plaintiff. (See Pl.'s Mem, Shulman Decl. Ex. C at 2.)

15

-- that because Walker ended his e-mails with a friendly and widely-used valediction, he therefore endorsed the contents of Glasser's e-mails -- is absurd on its face and inadvertently underscores the difficulty of discerning any intention on the part of defendant to grant TWC a license.

Plaintiff relies for its analysis on two cases -- Rico Records and Johnson v. Tuff-n-Rumble Management, Inc., No. Civ. A. 99-1374, 2000 WL 1145748 (E.D. La. Aug. 14, 2000) -- in which courts held that check endorsements could constitute a signed writing for the purposes of § 204(a) when analyzed in conjunction with parol evidence. As an initial matter, plaintiff misses a key difference between this case and both Rico Records and Johnson by overlooking the significance of a check endorsement: the very act of accepting payment from an alleged licensee can corroborate a copyright owner's intention to transfer its rights. This is rather different from a "signed endorsement," as plaintiff puts it (Pl.'s Mem. at 8), of an e-mail from a would-be licensee.

Moreover, the facts in Rico Records and Johnson were far stronger than plaintiff's allegations here. The Rico Records plaintiffs claimed copyrights to certain sound recordings performed by El Gran Combo de Puerto Rico ("El Gran Combo") based on checks that accompanied the purported transfers. Judge Rakoff held that endorsements on the checks -- such as "Purchase

16

of rights of ECG catalogue" and "Bonus on L.P. recording agreement" -- could be read to evidence a copyright transfer, and he therefore denied defendants' summary judgment motion with respect to these recordings. 2006 WL 846488, at *1. In Johnson, the language on the check expressly referred to an assignment of copyrights and "clearly indicate[d] that an ownership interest in copyrights [was] being transferred." 2000 WL 1145748, at *6; see also Dean v. Burrows, 732 F. Supp. 816 (E.D. Tenn. 1989) (endorsed check with notation that it was payment for copyright satisfied signed writing requirement of § 204(a)). In short, these cases involve written statements that, while arguably ambiguous, are nevertheless far clearer in intent than the writings that plaintiff has pointed to in this case.

Moreover, as defendant points out, the question of finality is critical to an analysis of the January 27th e-mails. Walker's e-mails do not set forth the terms of any exclusive license or distribution agreement, and they lack the suggestion of finality. We agree with the Ninth Circuit that "[w]ithout language indicating finality, § 204(a) is not satisfied." Radio Television Espanola S.A. v. New World Entm't, Ltd., 183 F.3d 922, 928 (9th Cir. 1999). In Radio Television Espanola, the plaintiff claimed that it had an oral agreement, followed by two confirmatory faxes, to license two television shows. The court held that the faxes were legally insufficient, observing that

17

"[a] mere reference to a deal without any information about the deal itself fails to satisfy the simple requirements of § 204(a)." Id. at 927.

As Radio Television Espanola indicates, Section 204(a) can be satisfied without much difficulty, but a valid writing must nevertheless clearly identify the deal and its basic parameters. Here, plaintiff has alleged no writing, such as a deal memorandum, that accomplishes this.   Rather, plaintiff alleges that it reached an oral agreement concerning the terms of the deal (Compl. ¶ 14.) and points to the statement in Glasser's first e-mail that the deal was for "exclusive worldwide distribution rights" (Pl.'s Mem. at 6 n.6.).   The purpose of the signed writing requirement is to ensure that the copyright owner deliberately transfers its ownership interest and that the owner does so in a way that provides the parties with a clear guide to their rights and responsibilities.   Effects Associates, 908 F.2d at 557.   The January 27th e-mails fail to accomplish this.

Plaintiff attempts to overcome these difficulties by focusing on the procedural posture of this case, arguing that the e-mail exchange is at least "susceptible to the interpretation that TWC and Smokewood had agreed to an exclusive license" and thus "create[s] a question of fact as to intent that cannot be determined on a motion to dismiss." (Pl.'s Mem. at 7.)   Here again, plaintiff focuses on Rico Records -- in

18

particular, Judge Rakoff's conclusion that because the check endorsements at issue were ambiguous, there was therefore a question of fact for the jury. (See id.) However, Judge Rakoff first concluded that the endorsements were sufficiently ambiguous that it was appropriate (as is common when interpreting vague contractual language) to resort to extrinsic evidence; it was only after concluding that the extrinsic evidence buttressed plaintiff's claim that he determined there was an issue of fact for the jury. 2006 WL 846488, at *1. The Court here finds no ambiguity in Walker's e-mails warranting the need for extrinsic evidence.[6]

More importantly, although plaintiff is correct that the Court's inferences at the motion to dismiss stage must favor plaintiff, those inferences must still be reasonable. Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). Here, the plaintiff urges the Court to employ inferences when reading the January 27th e-mail exchange that strain credulity. Simply put, there is no way to read Walker's e-mails

---

[6] Similarly, plaintiff argues that "to the extent that TWC and Smokewood disagree as to the meaning or scope of the alleged license, such disagreement presents an issue of material fact." (Pl.'s Mem. at 8.)   To support this contention, plaintiff cites Bourne v. Walt Disney Co., 68 F.3d 621 (2d Cir. 1995), a case in which the Second Circuit was interpreting an executed contract. Here, the parties are not arguing over "the meaning or scope" of a license; the parties' dispute concerns whether a license exists at all.   This is a legal question that can be resolved upon a motion to dismiss.

as constituting an intention to grant plaintiff an exclusive license. Under such circumstances, it is appropriate to grant a motion to dismiss. See Papa's-June Music, Inc. v. McLean, 921 F. Supp. 1154, 1158-60 (S.D.N.Y. 1996) (granting motion to dismiss for plaintiff's failure to allege signed writing satisfying § 204(a)).

Finally, the Court notes plaintiff's attempt to buttress its position by arguing that it is "customary in the entertainment industry" for parties to negotiate copyright transfers orally and for licensees to follow up with a confirmatory note indicating acceptance of a copyright owner's terms. (Pl.'s Mem. at 3.) As an initial matter, this is hardly unusual; virtually every contract negotiation has an oral component before the parties begin committing terms to writing. Further, although some courts have held that oral licenses can be validated by subsequent writings, those cases have involved narrow circumstances not present here.[7]    Indeed, in this

---

[7] These cases arise when plaintiff-licensees bring actions against third-party infringers, who, in turn, challenge the validity of the plaintiff's license on the ground that there was no contemporaneous signed writing between the copyright owner and plaintiff-licensee.

For instance, in Eden Toys, Inc. v. Florelee Undergarment Co., 697 F.2d 27 (2d Cir. 1982), defendant, a third-party infringer, argued that plaintiff had no standing to bring an infringement claim because it did not have a valid exclusive license from the copyright owner. Plaintiff countered that it had an oral license from the copyright owner that was subsequently formalized in a written agreement. On appeal from

particular case, the subtext of plaintiff's argument bears some resemblance to the one summarized in Effects Associates as: "Moviemakers do lunch, not contracts," 908 F.2d at 556. Congress did not exempt parties in the film industry from the requirements of the Copyright Act. Under § 204(a), a transfer of copyright ownership has not occurred unless and until the copyright owner unambiguously embodies its intention to a signed writing. Defendant did no such thing.

**B.   Breach of a Non-Exclusive License for Push**

Plaintiff argues that even if the Court finds that there is no valid signed writing under § 204(a), TWC has nevertheless stated a claim for breach of a non-exclusive license. For the reasons explained below, this argument is even more defective than plaintiff's claim to an exclusive license.

---

a summary judgment ruling in favor of the defendant, the Second Circuit remanded the case for findings on the question of whether a license between the copyright owner and plaintiff existed orally or through conduct. The court reasoned that the purpose of § 204(a) was "to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses." Id. at 36. In a case "in which the copyright holder appears to have no dispute with its licensee on this matter," the court explained that "it would be anomalous to permit a third party infringer to invoke [§ 204(a)] against the licensee." Id. at 36; accord Dan-Dee Imports, Inc. v. Well-Made Toy Mfg. Corp., 524 F. Supp. 615, 618-19 (E.D.N.Y. 1981); see generally 3 M. Nimmer, supra, § 10.03[A][3] (affirmatively quoting Eden Toys and noting that "the mere preparation of written proposals back and forth, which never resulted in a final meeting of the minds, does not suffice to confirm a purportedly 'oral contract'").

Plaintiff no doubt makes this argument because although the Copyright Act requires exclusive licenses to be evidenced by a writing, there is no such requirement for non-exclusive licenses. The Copyright Act defines "transfer of copyright ownership" to include exclusive licenses, but it expressly excludes non-exclusive licenses from the definition. See 17 U.S.C. § 101. Thus, the requirement contained in § 204(a) that a "transfer of copyright ownership" be contained in a writing does not apply to non-exclusive licenses, which can be granted orally or, in certain cases, implied by conduct. See Graham v. James, 144 F.3d 229, 235 (2d Cir. 1998).

Although the Second Circuit has not yet ruled on the precise circumstances under which an implied non-exclusive license will be found, our Circuit has followed the lead of other appeals courts and cautioned that implied non-exclusive licenses should be found "only in 'narrow' circumstances where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it." SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc., 211 F.3d 21, 25 (2d Cir. 2000) (quoting Effects Associates, 908 F.2d at 558); accord SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d 301, 317 (S.D.N.Y. 2000) ("An implied [non-exclusive] license can only exist where an

author creates a copyrighted work with knowledge and intent that the work would be used by another for a specific purpose.").

At least one other Circuit has reframed this standard into a more analytic test,[8] but the basic requirement remains clear: an implied non-exclusive license will only be found when a copyright owner creates a work at the request of the licensee and with the intention that the licensee exploit it.

Analyzing the Complaint under this rubric, it is clear that plaintiff has failed to allege facts sufficient to state a claim for breach of a non-exclusive license. Plaintiff has not alleged that it requested the creation of Push. To the contrary, plaintiff's Complaint clearly indicates that negotiations between the parties over the rights to the film began only after it was created and debuted at the Sundance Film Festival.

As the Supreme Court has recently made clear, a plaintiff cannot survive a motion to dismiss merely by alleging the violation of a legal right. "[L]egal conclusions . . . must be supported by factual allegations." Ashcroft v. Iqbal, --- U.S.

---

[8] Drawing on Effects Associates, the Seventh Circuit applies a three-part test: an implied exclusive license may arise when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." I.A.E., Inc. v. Shaver, 74 F.3d 768, 776 (7th Cir. 1996).

----, 129 S.Ct. 1937, 1950 (2009). Here, plaintiff has not alleged facts that would support the claim that TWC acquired a non-exclusive license for Push. Indeed, the facts alleged affirmatively belie such a finding.

Plaintiff cites three cases in which courts concluded that a copyright owner had granted an implied non-exclusive license to another party. In all of these cases, however, the work at issue was created by the copyright owner at the request of the licensee and with the intention that the licensee copy and distribute it. In other words, all of these cases follow the Effects Associates test that has been applied in this Circuit. See Lulirama Ltd. v. Axcess Broad. Servs., Inc., 128 F.3d 872 (5th Cir. 1997) (writer created advertising jingles at request of defendant and with the intention that defendant sell them to other parties); Jacob Maxwell, Inc. v. Veeck, 110 F.3d 749 (11th Cir. 1997) (composer created song at request of defendant, a minor league baseball team, and with the intention that defendant play it at games); I.A.E., Inc. v. Shaver, 74 F.3d 768 (7th Cir. 1996) (architect created preliminary drawings at the request of defendant and with the intention that defendant use them).

Plaintiff nevertheless argues that a failed attempt to acquire an exclusive license can result in an implied non-exclusive license and that, as a result, the Complaint has at a

minimum stated a claim for breach of a non-exclusive license. Although there are cases in which courts have held that an (invalid) oral agreement contemplating an exclusive license can nevertheless be enforced as a non-exclusive license, the licensees in those cases still satisfied the conditions necessary for a non-exclusive license -- that the work at issue was created at the licensee's request and with the intention that the licensee copy and distribute it. See Lulirama, 128 F.3d at 879-81; Jacob Maxwell, 110 F.3d at 752-53. Thus, even if the Court were inclined to accept the notion that an implied non-exclusive license can be granted where the parties attempt but fail to reach a binding agreement on an exclusive license,[9] plaintiff's Complaint would still fail to allege the necessary

---

[9] As Nimmer points out, according partial significance to an attempted grant of an exclusive license as a non-exclusive license "raise[s] serious questions under contract law, as the enterprise would plainly contravene the mutual intent of the parties." 3 M. Nimmer, supra, § 10-03[A][7]. Here, plaintiff's own e-mail clearly indicates that it was negotiating an "exclusive" license for Push. (Pl. Mem, Shulman Decl. Ex. A at 2.) Indeed, plaintiff has not even alleged that it ever wanted a non-exclusive license. In TWC's very first e-mail on the evening of January 27th, for instance, Glasser stated his belief that the company had acquired "exclusive worldwide distribution rights." (Id.)

Plaintiff's position in this case seems to be that a non-exclusive license should function as a sort of consolation prize for TWC's failure to successfully secure an exclusive license. The cases cited by plaintiff do not support this argument, which, if accepted by the Court, would undermine copyright owners' statutory rights by turning every failed negotiation for an exclusive license into a potential claim for a non-exclusive license.

facts to withstand a motion to dismiss for breach of a non-exclusive license.

### C.    Breach of a Binding Preliminary Commitment to Negotiate in Good Faith

Plaintiff's final theory is that defendant breached a binding preliminary commitment to negotiate with TWC in good faith when the defendant negotiated and then closed a competing deal with Lionsgate.  Like plaintiff's other theories, this too fails.

New York law recognizes the existence of binding preliminary commitments under certain, very narrow circumstances.[10]  The framework for analyzing whether such a commitment exists was provided by Judge Leval in Teachers Insurance & Annuity Ass'n v. Tribune Co., 670 F. Supp. 491 (S.D.N.Y. 1987), and has since been applied by the Second Circuit, see, e.g., Shann v. Dunk, 84 F.3d 73, 77 (2d Cir. 1996).

The Tribune opinion outlined two types of binding preliminary contracts:

> Type I is where all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities. Type II is where the parties recognize the existence of open terms, even major ones, but, having agreed on certain

---

[10] For the purposes of deciding this motion, the Court assumes that New York law would apply to this contract claim. (See Pl.'s Mem. at 14 n.4.)

important terms, agree to bind themselves to negotiate in good faith to work out the terms remaining open. In Type II agreements, the parties do not bind themselves to conclude the deal but only to negotiate in good faith toward conclusion within the agreed framework.

Shann, 84 F.3d at 77 (citing Tribune, 670 F. Supp. at 498). The first type of agreement "is preliminary only in form," and formalization "is not necessary" to fully bind the parties as to the terms of the agreement.    Tribune, 670 F. Supp. at 498. Plaintiff argues that it has stated a claim for the second type of agreement -- "an agreement to continue to negotiate in good faith and not an enforceable licensing and distribution agreement."   (Pl.'s Mem. at 13.)

Before proceeding to the specific factors that Tribune directs courts to consider when determining whether a Type II preliminary commitment exists, we must bear in mind the overarching principles outlined by Judge Leval.    When parties are negotiating an agreement, the default assumption is that "enforceable legal rights do not arise."   670 F. Supp. at 497. "It is fundamental to contract law that mere participation in negotiations and discussions does not create binding obligation, even if agreement is reached on all disputed terms."   Id. Courts must ensure that they "avoid trapping parties in surprise contractual obligations that they never intended."   Id.   For such reasons, "[t]here is a strong presumption against finding binding obligation in agreements which include open terms, call

for future approvals and expressly anticipate future preparation and execution of contract documents." Id. at 499.

The Tribune decision describes five specific factors to use when determining whether parties have entered into a preliminary binding commitment to negotiate in good faith: "(1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) any partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." Spencer Trask Software & Info. Servs. LLC v. RPost Int'l, 383 F. Supp. 2d 428, 446 (S.D.N.Y. 2003) (citing Tribune, 670 F. Supp. at 499-503).

### 1. The Language of the Alleged Agreement

The "first and most important" of the factors "looks to the language of the preliminary agreement for indication whether the parties considered it binding or whether they intended not to be bound until the conclusion of final formalities." Tribune, 670 F. Supp. at 499. Courts are to look to "the context of the overall agreement" and engage in a "full consideration of the circumstances and the contract language." Id. at 500.

Plaintiff focuses on defendant's purported failure to expressly reserve its right not to enter into a preliminary binding commitment and points to Judge Leval's observation that "a party that does not wish to be bound at the time of the

preliminary exchange of letters can very easily protect itself by not accepting language that indicates a 'firm commitment' or 'binding commitment,'" id. at 499. Plaintiff, however, ignores the context of the negotiations at issue in Tribune. There, the court found the parties' communications to be "replete with the terminology of binding contract." Id. The defendant, for instance, signed one of plaintiff's proposal letters with the words "Accepted and agreed to" and opened a subsequent letter of acceptance with the phrase "Attached is an executed copy of the Commitment Letter." Id.

Here, defendant never "accept[ed] language that indicate[d] a 'firm commitment' or 'binding commitment,'" id. Indeed, looking, as we must, at the full context of the communications, it is clear that although Glasser was keen on a binding commitment, there is nothing in Walker's e-mails that committed defendant to a deal. In his first response to Glasser, Walker wrote that he had "been on a call with the producers and financiers explaining every sentence" of TWC's proposal and that he was "relaying the contents of our conversation this afternoon." (Pl.'s Mem., Shulman Decl. Ex. A at 2.) In his second e-mail of the night, Walker stated that he was "explaining every detail to the producers and financiers and taking comments." (Id. at 1.) These e-mails do not suggest any intention on the part of Walker to enter into a preliminary

binding commitment to conclude the deal.   Rather, they suggest nothing more than that defendant was considering the deal on the table between the parties.

### 2.   The Context of the Negotiations

The court in <u>Tribune</u> placed particular emphasis on the circumstances surrounding the negotiations in that case. Specifically, the court observed that defendant needed to confirm the deal at issue -- a real estate financing commitment -- by a specific date, so that the agreement could be concluded in time for the defendant to realize a significant tax benefit. 670 F. Supp. at 500.

Here, the plaintiff has not alleged any reason that the defendant would have needed to secure a commitment to conclude the licensing deal and, thus, to enter into a binding preliminary commitment to negotiate in good faith for its completion.   In other words, plaintiff has failed to allege a reason (like the one in <u>Tribune</u>) that defendant would have found it advantageous to have a preliminary binding commitment to negotiate in good faith.

In other cases, however, courts have taken a more lax approach to the second <u>Tribune</u> factor, asking simply whether "the negotiations were at such a preliminary stage that the parties conclusively could have evinced no intent to be bound to a preliminary commitment."   <u>Spencer Trask Software</u>, 383 F. Supp.

2d at 446-47 (citing Cleveland Wrecking Co. v. Hercules Constr. Corp., 23 F. Supp. 2d 287, 298 (E.D.N.Y. 1998)). Without passing on the wisdom of this interpretation, the Court finds that such an analysis would favor plaintiff, given its allegation that the negotiations had virtually concluded by the time the parties exchanged their e-mails on January 27th.

In light of these competing approaches, the Court concludes that this factor weighs neither for nor against plaintiff.

### 3. The Existence of Open Terms

The Tribune decision counsels that "[t]he existence of open terms is always a factor tending against the conclusion that the parties have reached a binding agreement." 670 F. Supp. at 499. Nevertheless, when the alleged contract at issue is a preliminary binding commitment to negotiate in good faith to resolve open terms, "[t]o consider the existence of open terms as fatal would be to rule, in effect, that preliminary binding commitments cannot be enforced." Id.

In this case, plaintiff acknowledges that this factor "is neutral at this time." (Pl.'s Mem. at 17.) Plaintiff has not alleged that all major terms to the purported deal for Push were resolved during negotiations. On the other hand, plaintiff has not conceded that there were significant terms that had yet to be worked out between the parties. As such, the Court agrees

with plaintiff that the third <u>Tribune</u> factor is neutral on the facts as alleged.

### 4.    Partial Performance

Plaintiff has not alleged partial performance in this case, but this is not surprising.    Even assuming that the parties reached a binding preliminary commitment to negotiate in good faith on the evening of January 27th, it was clear less than ten hours later, when Walker sent an e-mail stating that there had "been no agreement reached" between the parties (Pl.'s Mem., Shulman Decl. Ex. C at 2), that defendant had no intention of finalizing a deal.    Thus, it is understandable that plaintiff would not have performed in any way, rendering this factor neutral in the analysis.    <u>See Hostcentric Techs, Inc. v. Republic Thunderbolt, LLC</u>, No. 04 Civ. 1621(KMW), 2005 WL 1377853, at *8 (S.D.N.Y. June 9, 2005) (where the absence of partial performance is "not surprising," the factor is "essentially neutral").

### 5.    The Necessity of Putting the Agreement in Final Form

Ultimately, this factor weighs decisively in favor of defendant.    In <u>Tribune</u>, the court framed the inquiry as "whether in the relevant business community, it is customary to accord binding force to the type of informal or preliminary agreement at issue."    670 F. Supp. at 503.    Plaintiff contends that "the

custom and practice in the entertainment industry is to negotiate deals orally, confirm them via e-mail and then commit them to writing at a later date." (Pl.'s Mem. at 17.)

Plaintiff's argument founders, however, when analyzed against the backdrop of § 204(a) of the Copyright Act. As discussed at length above, Section 204(a) requires a transfer of copyright ownership to be completed through a signed writing that clearly (though perhaps succinctly) evidences the parties' rights and responsibilities. While in many industries it is not unusual for parties to enter into oral contracts, and notwithstanding plaintiff's claims about "custom and practice" in the entertainment industry, federal copyright law dictates the terms by which an exclusive license can be granted.

To accept plaintiff's contention that parties can preliminarily bind themselves under state law to conclude exclusive licensing deals would be to open a serious loophole in the signed writing requirement of § 204(a) -- at least on facts such as those alleged here. Such an approach would undermine the twin concerns with certainty and clarity that underlie the provision, see Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 557 (9th Cir. 1990), and would raise concerns under the Supremacy Clause of the United States Constitution, see U.S. Const. art. VI, cl. 2. It is perhaps for such reasons that plaintiff has failed to identify a single case in which a court has found a

33

preliminary binding commitment between parties to conclude a transfer of copyright ownership.

The Court does not conclusively rule out the possibility that a copyright owner might enter into a binding preliminary commitment to negotiate in good faith over the final terms of a transfer of copyright ownership. It is possible, for instance, that a copyright owner could sign an unambiguous letter of intent to finalize a licensing deal, akin to what is often used in other industries. See, e.g., Crossroads Mortgage Corp. v. Columbia Equities, Ltd., No. 97 Civ. 1117(LMM), 1997 WL 363809 (S.D.N.Y. July 1, 1997). Alternatively, a licensee may secure from a copyright owner an assurance that the licensee is the only party with whom the owner is negotiating at a particular moment in time. Absent such indicia, however, the Court declines to hold that an alleged copyright licensee can state a claim for breach of a preliminary binding commitment merely by alleging negotiations between the parties and the existence of what are, upon any fair reading, decidedly non-committal e-mails from the copyright owner.

### Conclusion

For the foregoing reasons, defendant's motion to dismiss is granted. The Clerk of the Court is respectfully directed to close this case.

Dated:    New York, New York
          September 24, 2009

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been mailed on this date to
the following:

**Attorneys for Plaintiff**
David Boies, Esq.
Motty Shulman, Esq.
Peter Gwynne, Esq.
Andy Soh, Esq.
Boies, Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

**Attorney for Defendant**
Steven M. Hayes, Esq.
Hanly Conroy Bierstein Sheridan Fisher & Hayes, LLP
112 Madison Avenue
New York , NY 10016